IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STUART A. SARSHIK,

 Plaintiff,

v.                         No. 11-CV-00927 WJ/ACT

CORRECTIONAL MEDICAL SERVICES, INC.,

 Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendant Correctional Medical Services, Inc.'s Motion for Summary Judgment (Doc. 88), filed July 2, 2012. Plaintiff, Stuart Sarshik, filed this suit after his employment with Defendant was terminated, alleging wrongful discharge, violation of the New Mexico Whistleblower Protection Act ("NMWPA"), prima facie tort, and intentional infliction of emotional distress.[1] After considering the parties' briefs and the applicable law, for the reasons herein given the Court GRANTS Defendant's motion as to the NWMPA, prima facie tort, and intentional infliction of emotional distress claims, and DENIES it as to the wrongful discharge claim.

### BACKGROUND

The Court makes the following summary of material facts based on the briefs and exhibits filed in this case, viewed in the light most favorable to the Plaintiff and making every

---

[1] Plaintiff originally argued that, although he believed he was an at-will employee, to the extent that his relationship with Defendant was governed by an employment contract, his termination breached that contract. Doc. 1, at ¶¶ 160-163. Because Defendant does not dispute that Plaintiff was an at-will employee, Plaintiff has voluntarily withdrawn this claim, and the Court will not consider it further. Doc. 93, at 2 n.3.

1

permissible factual inference in favor of Plaintiff, for purposes only of the resolution of the present Motion for Summary Judgment.

In February 2011, Defendant offered Plaintiff employment as a Fast Track Medical Director for the state of New Mexico, which he accepted.[2]  In New Mexico, Plaintiff's immediate supervisors were Dr. Patrick Arnold, CMS Medical Director, and William Steiger, Vice President of Operations for the New Mexico region.  Plaintiff also reported to Dr. Jack Davidson, Chief Medical Officer for CMS and head of the Fast Track Program, located in St. Louis.  Plaintiff was an at-will employee.  On April 13, 2011, Defendant terminated Plaintiff's employment.  Plaintiff contends he was terminated because he complained to superiors at CMS about Arnold's medical incompetence and failure to provide adequate health care to inmates, in violation of medical ethics and the federal and state constitutions.

In particular, Plaintiff identifies five instances in which he complained to his superiors that patients had received inadequate medical care.  The first, in early March 2011, involved a patient treated by Arnold in a facility clinic in Plaintiff's presence.  The patient complained of pain in his right shoulder and back, and had a history of gallstones.  After listening to the patient's heart but performing no further examination, Arnold prescribed a muscle relaxant for back spasms.  Out of the patient's presence, Plaintiff told Arnold the patient was exhibiting classic symptoms of gallstones and should undergo surgery to remove the gallstones.  Arnold said surgery was unnecessary, and appeared displeased with Plaintiff.  Plaintiff does not know if the patient had surgery or what happened to the patient after this encounter.

The second instance also involved a patient treated by Arnold in a facility clinic in Plaintiff's presence, on the same day as the first.  The  patient, who had a plate surgically inserted in his leg, presented with pus draining from the insertion site.  Arnold listened to the

---

[2] The Fast Track program is designed to quickly initiate senior manager's into Defendant's culture.

patient's heart but did not otherwise examine the patient, and was ready to end the consultation. Plaintiff told Arnold that he had to probe the wound and take a sample to culture to determine the infecting agent. When Arnold did nothing more, Plaintiff called for a nurse to assist him, changed the dressing, and took a sample for a culture. Plaintiff had the impression, particularly from his facial expressions, that Arnold was displeased with him. After the visit, while they were driving away from the facility, Plaintiff again criticized the failure to culture the patient's wound, as well as the way Arnold handled patients from across the table. Arnold responded, "You don't know prison medicine. We do things different in prisons. That's what you're here to learn." Doc. 89-2, at 40 (p. 288: 13-16). Plaintiff also commented negatively on the fact that one of the doctors they had encountered was not Board certified. In response, Arnold pulled the car over to the side of the road, leaned directly over Plaintiff and said, "I'm not Board certified. What do you think about that? It's only a test." Plaintiff was "petrified" by Arnold's angry response.

The third instance, on or around April 4, 2011, involved a patient who had been admitted to the hospital with a strangulated hernia and was being discharged without surgery.[3] Arnold advised that the patient was being placed in a chronic care clinic, which Plaintiff understood as a facility designed to treat chronic conditions such as diabetes or hypertension. Plaintiff questioned the discharge and placement and was told that surgery was unnecessary because the hernia had resolved itself spontaneously. Plaintiff then told Arnold that he felt the patient had been handled improperly and should have surgery; called Defendant's central office in St. Louis and told someone there he felt the patient should have surgery; and called the on-site physician treating the patient and told him that the patient should have surgery. Arnold did not agree with

---

[3] Each day, Plaintiff and Arnold teleconferenced with nurses or physicians located at the facilities serviced by Defendant, and a representative of Defendant in St. Louis. The purpose of this daily call was to review the on-site and off-site medical services required in the last 24 hours. Plaintiff learned about the remaining patients through this daily call.

Plaintiff or take further action to ensure the patient had surgery, and indicated nonverbally that he was displeased with Plaintiff. Plaintiff does not know whether the patient ultimately had surgery.

The fourth instance, also sometime in April 2011, involved a patient who had been stabbed in the chest and had been treated with two chest tubes to drain blood from the chest and to expand the lungs. Before the patient could be discharged, the chest tubes had to be removed and an x-ray performed to determine whether the lungs remained expanded without the tubes. After the first chest tube was removed, the patient's chest remained expanded, but removal of the second chest tube and an x-ray required an additional day's stay in the hospital. Arnold wanted to deny payment for the additional day on the ground that the hospital should remove the second chest tube and discharge the patient without performing an x-ray. Plaintiff told Arnold that it was unsafe to discharge the patient before the x-ray and that the additional day was medically necessary. Arnold was visibly upset and displeased with Plaintiff's statement. The patient ultimately had the chest tube removed, received an x-ray, and was discharged.

The final instance, occurring in early April 2011, involved a patient who was admitted to the University of New Mexico hospital for blood in his urine and diagnosed with a bladder tumor. Plaintiff was surprised that the patient came up in two or three daily calls in a row because he understood removing a bladder tumor to be "an in and out procedure." He called the patient's facility and found out that the tumor had been so large and invasive that it had infiltrated the bladder wall, and during surgery to remove the tumor the bladder had been perforated. As a result, the patient was scheduled to have his bladder removed in June, which could shorten his life. On or about April 8, 2011, the treating physician, Dr. Leopold Raschbaum, called Plaintiff and told him that the patient had shown blood in his urine for years

before the surgery, and that Arnold had refused his requests to have the patient seen by a urologist. Arnold was Raschbaum's supervisor.

Plaintiff contacted five people in the company about the patient with the bladder tumor. First, on April 11, he contacted his supervisor, Steiger, told him that "there's a horrible case that went on, it's CMS's fault as relayed to me," and asked what procedure he should follow for risk management. Steiger said he did not know. Second, on the same day, Plaintiff spoke with Timothy Florence, director of pharmacy, told him the medical details of the case and that the patient had not received care for the bleeding, and asked how he should handle it. Florence said he did not know, and suggested Plaintiff call someone in the legal department. Third, also on April 11, Plaintiff spoke to Elizabeth Szekely, the Regional Infection Control Nurse for New Mexico, about the case and asked for her advice, but she had none. Fourth, on or about April 11, April 12, or April 13, Plaintiff contacted Gail Kujawski, director of nursing, told her the medical details of the case, and asked "what does one do when one hears risk situations of the company." She did not know. Florence, Kujawski, and Szekely supervise neither Plaintiff nor Arnold. Finally, Plaintiff tried to contact Maya Patel in Defendant's legal department, first by phone and then by e-mail. On April 11, 2011, he left a voice mail saying, "I need to talk to you about a particular case that I think may come to your attention at some point." His e-mail, sent the next day, said, "Left you a voicemail. Please give me a call when you have a moment." Patel never responded to either.

In addition to the above conversations, Plaintiff spoke twice with Dr. Davidson about his concerns regarding patient care and Arnold's medical competence. The two met in New Mexico in March 2011, when Plaintiff criticized Arnold's "functioning as a physician and his knowledge base and/or his lack of knowledge in medical areas." In particular, Plaintiff told Davidson that Arnold was "sorely lacking" in skills necessary for "utilization review," that "he didn't possess

5

those communication skills that were necessary . . . and his essential medical competence was lacking," and that he had a practice of not physically examining patients. Plaintiff additionally complained about Arnold's personal characteristics, including that he was consistently late; that Arnold's car, in which Plaintiff had to ride when they visited facilities, was filthy; and that Arnold regularly mocked, made fun of, and ridiculed him and others. According to Plaintiff, Davidson responded, "You're here . . . not to change anything, but to observe what's going on;" "Don't make waves;" and "You have to learn to work with people less intelligent than you."

Plaintiff next spoke with Davidson on April 7, 2011, in a teleconference including Robert Manche, Manager of Physician Recruiting for CMS. During that conversation Plaintiff again criticized Arnold's medical abilities. Although he acknowledges that "he didn't go into any specific patients at all," he also states that he "conveyed to Dr. Davidson [his] belief that Arnold was improperly denying consult requests," and that "[i]f Dr. Davidson didn't understand that from [their] conversations, then he wasn't trying to understand that."[4] Additionally, Plaintiff made further personal complaints about Arnold, including that (1) he was arrogant, rude, and condescending; (2) he was consistently late, without apology; (3) he called Plaintiff "spoiled" because his family had servants while he was growing up; and (4) during a trip to Roswell, he pulled the car over to the left shoulder of a divided stretch of road and urinated on the median, and because of the wind, Plaintiff had to jump out of the car on the other side to avoid blowing urine. Davidson asked Plaintiff what he felt would be a solution to the problems with Arnold, and Plaintiff replied that he wanted to stay in New Mexico to complete his term of employment, and that Dr. Renee FallHowe, Defendant's Chief Medical Officer, should work with Arnold to

---

[4] A consult request is a request made by a site physician to the regional medical director for services to be provided off-site and/or by a specialist consultant. If the regional medical director disagrees that the services are medically necessary or with the proposed treatment, he or she proposes an alternative treatment plan. The site physician then decides whether to accept the regional medical director's alternative or to proceed with the original treatment. For instance, Raschbaum's request for the bladder tumor patient to see a urologist was a consult request.

address his deficiencies. Davidson also asked Plaintiff what he could do differently to improve the situation, and Plaintiff had no reply.

The day before Plaintiff's teleconference with Davidson and Manche, on April 6, 2011, Arnold sent an e-mail to Davidson about Plaintiff. Arnold explained that he had spoken extensively with Steiger about "the issues which arose over the last two days," which Plaintiff characterizes as his own complaints about the bladder tumor patient's care.[5] Arnold also wrote that he had tried to call Davidson to discuss Plaintiff's "accusations," that he would no longer "serve as [Plaintiff]'s mentor," and that his e-mail was "not a resignation, not just an update of our previous conversations."

On April 13, 2011, Defendant terminated Plaintiff's employment during a teleconference with Davidson and Steiger. According to Davidson, he made this decision on April 7 or April 8. Manche states that the decision was made "sometime after April 7th."

## ANALYSIS

### I.     Legal Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; he may not rest on mere allegations or

---

[5] The chronology surrounding Plaintiff's discovery of the bladder tumor patient is unclear. Plaintiff stated in his deposition that after finding out why the patient had stayed in the hospital so long, he conveyed that information on the daily call. By his own account, he did not raise criticisms about the patient's care until after speaking with Raschbaum on or after April 8, and does not appear to have spoken to anyone not involved in this patient's care until April 11. Plaintiff characterizes Arnold's April 6 e-mail as "a smoking gun," but it appears to have been written before Plaintiff found out Arnold had denied consults for the bladder tumor patient.

denials in his own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). In order to avoid summary judgment, the nonmoving party must put forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor. *Id.* at 249. A mere scintilla of evidence in the nonmovant's favor is not sufficient. *Id.* at 252.

**II.   Wrongful Discharge Claim**

New Mexico first recognized a claim for wrongful discharge in contravention of a clear mandate of public policy in *Vigil v. Arzola*, 699 P.2d 613, 617-21 (N.M. App. 1983), *rev'd in part on other grounds*, 687 P.2d 1038 (1984). "For an employee to recover under this new cause of action, he must demonstrate that he was discharged because he performed an act that public policy has authorized or would encourage, or because he refused to do something required of him by his employer that public policy would condemn." *Id.* at 620. The employee must also show a causal connection between his actions and the employer's retaliatory discharge. *Id.* "A general allegation that the discharge contravened public policy is insufficient; to state a cause of action for retaliatory or abusive discharge the employee must identify a specific expression of public policy." *Id.* at 621. Courts interpreting New Mexico law have construed this claim narrowly and declined to expand its application. *Shovelin v. Cent. New Mexico Elec. Co-op., Inc.*, 850 P.2d 996, 1007 (N.M. 1993) (collecting cases).

*Vigil* identified four sources for statements of public policy. 699 P.2d at 619-20. The first includes statutes defining public policy that both protect employees and provide a remedy, such as the New Mexico Human Rights Act addressing discriminatory practices. *Id.* The second includes statutes identifying an employee right without specifying a remedy, such as the prohibition against discharging an employee because of his or her political beliefs; such statutes require courts to imply a remedy. *Id.* at 620. The third includes statutes defining public policy without specifying either a right or a remedy, requiring judicial recognition of both. *Id.* (citing

8

*Petermann v. Int'l Brotherhood, Etc.*, 344 P.2d 25 (Cal. App. 1959) (recognizing claim for wrongful discharge where employee refused to commit perjury).  The last includes judicial recognition of a right as well as a remedy in the absence of legislation.  *Id.* (citing *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876 (1981)).

Plaintiff identifies the public policies contravened by his termination as "ensur[ing] that prisoners in [New Mexico Corrections Department]'s custody were provided with adequate medical care," and "protect[ing] and guard[ing] patients from inadequate medical care and unqualified health care professionals."  He grounds these policies in two sources: (1) regulations governing the practice of medicine, including the Hippocratic Oath, the Medical Practice Act, section 61-6-15.1 of the New Mexico Statutes, and section 16.10.8.9 of the New Mexico Administrative Code; and (2) the Eighth Amendment of the United States Constitution and Article II, Section 13 of the New Mexico Constitution, which require that prisoners be provided with adequate medical care.

<u>New Mexico Statutes Governing the Practice of Medicine.</u>  These statutes Plaintiff cites fall into the third category identified in *Vigil*, legislative expressions that neither identify a right nor provide a remedy, and require the Court to recognize both.  This Court declines to do so, as the statutes fail to provide a sufficiently specific expression of public policy to support Plaintiff's claim.  While they allude to public safety, they address the state's power to license physicians and discipline them for breaches of medical ethics.  To ground Plaintiff's claim in these statutes would be to expand the wrongful discharge claim beyond its current narrow bounds.

<u>Constitutional Provisions Regarding Inmate Health Care.</u>[6]  Defendant contends that *Shovelin v. Cent. New Mexico Elec. Coop., Inc.* precludes ever finding a specific expression of

---

[6] Plaintiff cites both the Eighth Amendment of the Federal Constitution and Article II, Section 13 of the New Mexico Constitution, which are largely identical.  States may construe their constitutions to provide more protection than the Federal Constitution.  *See*, *e.g.*, *State v. Gomez*, 932 P.2d 1, 6 (N.M. 1997).  Plaintiff "does not argue,

public policy in a constitutional provision. 850 P.2d 996, 1009-1011 (N.M. 1993) (declining to ground a statement of public policy in a constitutional provision and citing out-of-state cases likewise declining). This Court reads *Shovelin* as rejecting only that plaintiff's attempt to ground a specific expression of public policy in particular constitutional provisions. *Id.* at 1009-10 (concluding constitutional provisions did not express a public policy encouraging a citizen to run for public office). Instead, this Court finds a strong public policy in support of providing adequate health care for inmates under Eighth Amendment standards. *See Vigil*, 699 P.2d at 620 ("We do not purport to identify every category of public policy, but instead leave the determination to a case-by-case analysis."); *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (1981) ("[P]ublic policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions.").

      The Eighth Amendment's "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . . establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotation marks and citation omitted). However, negligence in diagnosis or treatment is insufficient to allege a constitutional violation; "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106; *Cordova v. LeMaster*, 96 P.3d 778, 786 (N.M. 2004). To show "deliberate indifference," a plaintiff must allege both "an objective component requiring that the pain or deprivation be sufficiently serious; and a subjective component requiring that

---

however, that we should interpret our state constitution to provide . . . greater protection than . . . is afforded by the federal constitution and has not articulated a basis for construing the state constitutional provisions more broadly than the federal. We therefore address his claims only under the federal provisions." *Cordova v. LeMaster*, 96 P.3d 778, 781 (N.M. 2004).

[prison] officials act with a sufficiently culpable state of mind." *Miller v. Glanz*, 948 F.2d 1562, 1569 (10th Cir.1991).

Objectively, a medical need is sufficiently serious if a physician has diagnosed it as requiring treatment, or even a lay person would easily recognize the necessity for a doctor's attention. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Where the necessity for treatment would not be obvious to a lay person, the physician's medical judgment, even if grossly negligent, may not be second-guessed in the guise of an Eighth Amendment claim. *See*, *e.g.*, *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir.1997). Subjectively, an inadvertent failure to provide adequate medical care or a negligent diagnosis "fail[s] to establish the requisite culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Thus, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. The subjective component is met only if a prison official "'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock*, 218 F.3d at 1209 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) ("However, even if a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk.").

This Court finds that issues of genuine, triable fact remain concerning whether Defendant acted with deliberate indifference to inmates' serious medical needs. Plaintiff clearly disliked Arnold and devoted much, if not the majority, of his conversations with Davidson and Steiger to complaints about Arnold's personal qualities. However, because Plaintiff raised his personal issues with Arnold does not nullify his other statements regarding Arnold's incompetence and failure to provide adequate care to inmates. To the extent that Arnold failed to provide adequate

11

healthcare because he was a poor physician, his behavior may fall under mere negligence.[7]  But the defendant here is CMS, not Arnold.  Plaintiff has alleged facts from which a reasonable juror could infer that Davidson and Steiger were aware that Arnold's incompetence posed a substantial risk of harm to inmates and failed to take reasonable steps to alleviate the risk.[8]  Further, because Arnold is Defendant's regional medical director, his knowledge – and the criticisms Plaintiff raised to him directly – may be imputed to the company generally.  *See W. Diversified Services, Inc. v. Hyundai Motor Am., Inc., 427 F.3d 1269, 1276* (10th Cir. 2005) ("It is well established that a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority.").

In addition, the parties dispute when exactly Plaintiff found out about and raised his concerns about the bladder tumor patient and when exactly Defendant decided to terminate Plaintiff.  Taking the evidence in the light most favorable to the Plaintiff, Defendant may have terminated Plaintiff only after – and almost immediately after – he talked to his supervisors about the bladder tumor patient, a timeline that supports a reasonable inference of a causal connection between Plaintiff's complaints and his termination.[9]

Accordingly, the Court denies the Defendant's motion with respect to Count 1 of the Complaint.

### III. New Mexico Whistleblower Protection Act ("NMWPA") Claim

The NMWPA proscribes a public employer from retaliating against an employee who:

---

[7] However, failure even to remove the bandage from a wound leaking pus arguably crosses the boundary from mere negligence to indifference.  *See Sealock*, 218 F.3d at 1209 (deliberate indifference exists where medical need "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").

[8] Davidson testified that CMS did not investigate what happened to the bladder tumor patient, and he did not know what had happened to the patient.

[9] Although this case involves a common law wrongful discharge claim, not a Title VII claim, the Court notes that under Title VII, "[f]or purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008).

>A. communicates to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act;
>
>B. provides information to, or testifies before, a public body as part of an investigation, hearing or inquiry into an unlawful or improper act; or
>
>C. objects to or refuses to participate in an activity, policy or practice that constitutes an unlawful or improper act.

N.M. Stat. Ann. § 10-16C-3C.  It further defines "public employer" as:

>(1) any department, agency, office, institution, board, commission, committee, branch or district of state government;
>
>(2) any political subdivision of the state, created under either general or special act, that receives or expends public money from whatever source derived;
>
>(3) any entity or instrumentality of the state specifically provided for by law; and
>
>(4) every office or officer of any entity listed in Paragraphs (1) through (3) of this subsection;

N.M. Stat. Ann. § 10-16C-2C.  Finally, it defines "unlawful or improper act" as:

>a practice, procedure, action or failure to act on the part of a public employer that:
>
>(1) violates a federal law, a federal regulation, a state law, a state administrative rule or a law of any political subdivision of the state;
>
>(2) constitutes malfeasance in public office; or
>
>(3) constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public.

N.M. Stat. Ann. § 10-16C-2.

Courts must "give effect to the Legislature's intent by first looking at the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Schuster v. State Dept. of Taxation & Revenue, Motor Vehicle Div.*, 283 P.3d 288, 292-93 (N.M. 2012) (internal quotation marks and citation omitted).

Here, Defendant is a privately-held, for-profit corporation. Defendant's contract with the New Mexico Corrections Department states,

> The Contractor is an independent Contractor performing professional services for the New Mexico Corrections Department [NMCD] and is not an employee of the State of New Mexico. Contractor shall not accrue leave, retirement, insurance, bonding, use of State vehicles, or any other benefits afforded to employees of the State of New Mexico. . . . Contractor shall not purport to bind NMCD, its officers or employees, nor the State of New Mexico to any obligation not expressly authorized herein.

Doc. 89-1, Ex. A. Both under the plain language of the NMWPA and under the terms of the contract, Defendant is not a public employer, and therefore does not come under the NMWPA.

Plaintiff contends that because Defendant fulfills the traditional governmental function of providing health care to inmates, it constitutes an instrumentality of the state, and therefore falls under the NMWPA. However, the statute requires that the public employer be an instrumentality of the state "specifically provided for by law." Because no law specifically provides that a private correctional company hired by the state corrections department constitutes an instrumentality of the state, Plaintiff's argument must fail.[10]

Because this Court concludes that Defendant is not a public employer, it need not address whether Plaintiff's behavior constitutes whistleblowing under the NMWPA.

Accordingly, the Court grants Defendant's motion with respect to Count 2 of the Complaint.

## IV.    Prima Facie Tort Claim

---

[10] Plaintiff also argues that it is illogical to find Defendant is not an instrumentality of the state under the NMWPA given that a hypothetical inmate plaintiff could bring a 42 U.S.C. § 1983 suit for constitutionally inadequate health care against Arnold and CMS as "state actors." This argument fails because it elides federal law governing § 1983 claims with state law. Logic does not require that a state actor under the former scheme constitute a public employee under the latter. *See Giron v. Corr. Corp. of Am.*, 14 F. Supp. 2d 1245, 1252 (D.N.M. 1998) (finding the defendant, a corrections officer employed by a private company under a contract with the state Corrections Department, to be a state actor under § 1983, but not a public employee under the state Tort Claims Act, because "[t]o act 'under color of state law' under § 1983 and to act as a 'public employee' under the Tort Claims Act, are distinct concepts").

Under New Mexico law, a plaintiff alleging a prima facie tort must prove "1. An intentional, lawful act by defendant; 2. An intent to injure the plaintiff; 3. Injury to plaintiff; and 4. The absence of justification or insufficient justification for the defendant's acts." *Schmitz v. Smentowski*, 785 P.2d 726, 734 (N.M. 1990). This tort is intended to provide a remedy for injuries that "fall outside of the rigid traditional intentional tort categories." *Id.* However, it "should not be used to evade stringent requirements of other established doctrines of law." *Id.* at 738.

Courts interpreting New Mexico law have concluded that a plaintiff alleging wrongful termination in at-will employment cannot bring a prima facie tort claim. *See Hill v. Cray Research, Inc.*, 864 F. Supp. 1070, 1078 (D.N.M. 1991) (finding it impossible to satisfy the elements of a prima facie tort in the at-will employment context); *Yeitrakis v. Schering-Plough Corp.*, 804 F. Supp. 238, 249 (D.N.M. 1992) (concluding "*prima facie* tort is unavailable to remedy the termination of an at will employee, even where he is terminated for bad cause"); *Dimond v. Innovative Services, Inc.*, CIV 95-0071 JC/WWD, 1995 WL 877501 (D.N.M. July 5, 1995) (allowing a prima facie tort claim "would eviscerate the doctrine of 'at-will' employment"); *Negrete v. Maloof Distrib. L.L.C.*, 762 F. Supp. 2d 1254, 1287 (D.N.M. 2007) ("A plaintiff may not advance a claim for wrongful termination of an at-will employment 'under the guise of prima facie tort,' because that 'would emasculate the doctrine of employment terminable at will.'" (quoting *E.E.O.C. v. MTS Corp.*, 937 F. Supp. 1503, 1516 (D.N.M. 1996)); *Cordova v. PNM Elec. & Gas Services*, 72 F. App'x 789, 793 (10th Cir. 2003) ("New Mexico law does not recognize a claim for prima facie tort in employment-at-will situations.").

Plaintiff urges this Court to depart from the above cases by suggesting they derive from dicta in *Schmitz* misreading a Missouri case. Doc. 93 at 34. However, the analysis in *Hill* finding the elements of prima facie tort inconsistent with a wrongful discharge claim is

15

independent from the portion of *Schmitz* Plaintiff characterizes as dicta. *Compare Schmitz*, at 109 N.M. at 738 ("[P]rima facie tort should not be used to evade stringent requirements of other established doctrines of law." (citing to *Lundberg v. Prudential Ins. Co. of America*, 661 S.W.2d 667, 671 (Mo. Ct. App. 1983)) *with Hill*, 864 F. Supp. at 1078 ("[U]nder no set of circumstances can Plaintiff satisfy the essential elements of the tort. If Defendants' termination of Plaintiff's employment was in breach of an implied contract or a tortious wrongful discharge, and thereby in either instance *unlawful*, the first element of a lawful act cannot be met. If those claims are unfounded and the termination was thereby lawful, in accordance with the employment at will doctrine, the second element of an intent to injure cannot be met.")

Further, Plaintiff suggests *Beavers v. Johnson Controls World Serv., Inc.* supports the proposition that a an at-will plaintiff alleging wrongful termination may bring a prima facie tort claim. 120 N.M. 343, 348 (N.M. Ct. App. 1995). However, because *Beavers* addressed whether a prima facie tort claim is barred by the Worker's Compensation Act, not the at-will employment doctrine, it is inapposite here. And while Plaintiff correctly notes that a prima facie tort may be pleaded in the alternative through the completion of trial, *see Schmitz*, 109 N.M. at 736, this doctrine is distinct from and does not overrule the bar on bringing a prima facie tort in the at-will employment setting.

Accordingly, the Court grants Defendant's motion with respect to Count 3 of the Complaint.

## V.      Intentional Infliction of Emotional Distress Claim

To prove a claim for the intentional infliction of emotional distress, Plaintiff must establish that "(1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's

conduct and the claimant's mental distress." *Hakkila v. Hakkila*, 812 P.2d 1320, 1330 (N.M. Ct. App. 1991) (Donnelly, J., specially concurring). New Mexico follows the *Restatement* definition of extreme and outrageous conduct as "that which is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 41 P.3d 333, 342-43 (N.M. 2001) (quoting *Restatement (Second) of Torts* § 46 cmt. D); *see also Stieber v. Journal Publ'g Co.*, 901 P.2d 201, 205 (N.M. Ct. App. 1995). A plaintiff must also show that he or she suffered "severe" damages, meaning that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." *Jaynes v. Strong-Thorne Mortuary, Inc.*, 954 P.2d 45, 50 (N.M. 1997) (internal quotation marks and citation omitted). "Only in extreme circumstances can the act of firing an employee support a claim of intentional infliction of emotional distress." *Stock v. Grantham*, 964 P.2d 125, 136 (N.M. Ct. App. 1998).

Plaintiff's claim that Defendants engaged in extreme and outrageous conduct is weak. That he was terminated in front of a witness (William Steiger) does not constitute "atrocious and utterly intolerable" behavior. *See Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 432, 773 P.2d 1231, 1239 (1989) (firing employee for dishonesty and shouting "I don't trust you" on the sales floor not extreme and outrageous); *see also Williams v. First Tennessee Nat. Corp.*, 97 S.W.3d 798, 805 (Tex. App. 2003) (telling the plaintiff in front of other employees that he was fired and ineligible to be rehired not extreme and outrageous). Wrongful termination in and of itself does not support an IIED claim. *See E.E.O.C. v. MTS Corp.*, 937 F. Supp. 1503, 1514 (D.N.M. 1996) (termination, even when based in discrimination against the plaintiff because he had AIDS, was not extreme or outrageous); *Salazar v. Furr's, Inc.*, 629 F. Supp. 1403, 1411 (D.N.M. 1986) (terminating employee because she was pregnant and in effort to deny her pension benefits,

17

while "surely hurtful and unpleasant," was not extreme or outrageous). Plaintiff provides no authority supporting his further allegation that Defendant engaged in extreme and outrageous conduct by requiring him to "sit idly by" and watch individuals suffer from lack of adequate medical care, forced to witness "what could be fairly labeled as not dissimilar to torture."

Regardless of whether Defendant's behavior constitutes extreme and outrageous conduct, Plaintiff claim fails because he has not shown that he suffered severe and extreme emotional distress. He alleges he was "upset for weeks" by being terminated in front of a witness (William Steiger) because it was "an embarrassment;" he was "in shock . . . obviously emotionally upset, perturbed;" the termination "just did [him] in, just the way it was done;" and he suffered "psychological embarrassment" from having to tell people he was fired after only seven weeks. However, he does not allege that this distress incapacitated him in any way, and he did not seek medical treatment or counseling, or take any medications to address it. Under New Mexico law, his distress is not so severe that a "reasonable person" could not "cope adequately" with it. *See Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 41 P.3d 333, 343 (N.M. 2002) (emotional distress not severe where fired employee took offense at by being called "Sir" in his termination letter, resented being fired after giving his employer so many years, slept long hours, had erratic eating habits, felt "lousy" and depressed, and began taking Prozac); *Bhandari v. VHA Sw. Cmty. Health Corp.*, CIV 09-0932 JB/GBW, 2011 WL 1336512, *47 (D.N.M. Mar. 30, 2011) (emotional distress not severe where the plaintiff experienced sleeplessness; wanted to cry, but did not; was "devastated;" did not seek counseling outside of his house, but spoke to his wife, a mental health professional; did not seek medication for his emotional distress or sleeplessness; was scared to go outside of his home and did not go anywhere for approximately a week; and did not contact any physician to discuss his purported emotional distress). Nor does Plaintiff distinguish distress over his termination from the normal distress felt by any person who is fired from a job. *See Cox*

*v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988) ("[W]hile loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event and cannot provide a basis for recovery for intentional infliction of emotional distress.").

Accordingly, the Court grants Defendant's motion with respect to Count 5 of the Complaint.

## CONCLUSION

In conclusion, Plaintiff has not demonstrated the existence of facts which, taken in the light most favorable to his assertions, would support his NMWPA, prima facie tort, and intentional infliction of emotional distress claims. Accordingly, Defendant's Motion for Summary Judgment (Doc. 88) is GRANTED as to those claims. Because a genuine issue of triable fact remains as to Plaintiff's wrongful discharge claim, Defendant's Motion for Summary Judgment is DENIED as to that claim.

**SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE